Our first case today is John Marozin v. Philadelphia Housing Authority, number 21-2960. Mr. Olseas? Good morning again, your honors. If it pleases the court, my name is Andrew Olseas. I'm with Karff, Karff & Cerruti, representing the appellant, John Marozin. I would like to reserve three minutes for rebuttal. Granted. The matter before us this morning is about retaliation and race discrimination and comes down to whether a reasonable jury, considering the facts in the light most favorable to the appellant, Mr. Marozin, can determine that the real motive for his termination was retaliation and or discrimination as opposed to appellee's asserted reasons. In order to show that, an appellant can dispute the purported reasons for his termination and show evidence that retaliation and or discrimination were more likely than not the reason for his termination. Here, Mr. Marozin can sufficiently show... Is your argument really retaliation based on the timing? Ten days isn't a very long time. Do you have a discrimination claim that's viable on appeal or are you really focused on retaliation? Both claims, I believe, have merit and both claims, I believe Mr. Marozin has the right to be heard in front of a jury to be decided. What's your better claim? Retaliation, I believe, in terms of the timing, is actually closer in time than ten days. And other than timing, do you have anything for retaliation? What evidence do you have for retaliation? In addition to the timing, there's also the shifting rationale by appellee Bart, the decision maker with his termination. There's also PHA, appellee PHA, going against the standard policies in terms of discipline. At the time of Mr. Marozin's termination, he did not have any discipline issued against him and it was immediately towards termination rather than a progressive discipline of a verbal, written, and subsequent compared to other African American co-workers that he worked with. In terms of the retaliation, going right to the timing, the protected activity here is Mr. Marozin complained about not being compensated accurately. As a lieutenant for the police department, he was paid hourly and subject to overtime. The first time he complained in writing, April 14, 2016, he sent a complaint. Which other people complained about pay and were not fired? There were other employees, other officers that did complain about pay. I don't have any information on the record about whether they were terminated or not subsequently, but the difference here in terms of Mr. Marozin compared to those other officers was the fact that he complained in writing repeatedly directly to the chief of police, Mr. Bard. Also, the amount of money that he was requesting and complaining about being unpaid was $5,000. But if the real reason for the termination was complaining about pay, then all the other people that complained about pay would have been fired as well and there's no support in the record for that. There is no support. But there is clear tension between Bard and Marozin. Bard was claiming that Marozin was insubordinate. Bard claimed that Marozin was not honoring his new approach toward community policing. Bard complained that Marozin was challenging Bard's view about the proper jurisdiction of the police. Those things are all true, right? Well, they are from Bard's perspective. On the record, Mr. Marozin testified that there was no hostility between him leading up to his termination. And in fact, all these issues that Chief Bard brought up only came up during discussions with Apelli Strauss about deciding to terminate him, which happened only one day after Marozin complained again in writing on May 22, 2016, about him being owed $5,000 and distinctly from the other officers on the record that complained, for the first time he threatened outside action. He told Chief Bard, he told Joanne Strauss, he also CC'd the Office of Audit and Compliance, that he was going to, if this was not resolved, seek outside action, either get an attorney or, as Chief Bard testified, was concerned about the Department of Labor getting involved. The very next day, all of a sudden now, Bard goes to Strauss with the intent to terminate and the action to terminate Mr. Marozin. And he goes to him and says, first he goes to Strauss and says, Marozin is a disruption. I want to terminate him because he's a disruption. Nothing else is said. And Strauss says, that's not a good reason to terminate anyone, let alone a decorated officer like Marozin. Because, again, at the time, lieutenant, no prior discipline, and had been an officer for over 15 years. He then shifts gears and says, no, I want to terminate him because he's at will. Which, of course, in Pennsylvania he was at will. This is, again, correct. He also told, the timing doesn't look good here. Strauss told him. She's an attorney herself. She, for the first time in her history, she testified against Chief Bard's recommendation, did not want to terminate this employee. The only time she ever said she did not want to terminate the employee. She said because she knew the day before, and he repeatedly had complained about his pay, and said the timing does not look good here. Let's say we agree with you on the timing. The district court tossed your case on retaliation at the prima facie case, correct? Correct. And then had a fallback holding on pretext. Let's assume that you've persuaded us on the prima facie case. How do you get over the pretext hurdle? Well, certainly the timing used in the argument for causation in prima facie is also a part of pretext. But it's not right. But it's not dispositive. It's part of it. It's in the mix. It has to be considered. But you'd concede it's not dispositive. If it were dispositive, there would be conflating prong one and prong three, correct? What I would agree to is that there are additional information in terms of the shifting rationale from Chief Bard, them going against their policy, frankly named Appellee Strauss disagreeing with this termination altogether. All of that combined, in addition to the timing, shows pretext. That there's a question for the jury to take. But she disagreed with it first, then she agreed with it, right? She never green-lighted it. Bard did it on his own initiative. Bard had the power to fire Mrozin on his own. Correct. That's my understanding that Strauss testified. She never agreed with it, never came around to seeing the light that Bard was arguing. Bard overruled her and went ahead with the termination. He was fired on the 15th of June. It was Bard that fired him? Correct, yes. Bard fired it. Strauss was involved in drafting the document. But it was under the instruction and orders of Chief Bard. She never agreed with it, testified she was never agreeing to his termination, and again stated that was the only termination she was involved with in any capacity she did not agree with. I don't remember that being a key issue in the district court. Did the district court say anything about that? It was noted certainly in my response to summary judgment how important it was that the named defendant, Strauss, disagreed with it. My recollection from the district court's decision was Well, that gets Strauss out of the case, right? If Strauss never green-lighted it, then Strauss can't be liable. From our understanding, she was obviously still involved because she signed off on it, but based on the instruction and order of defendant Bard, Chief Bard. Well, if she signed off on it, then that sounds like she's the final decision-maker. I would disagree with you, Your Honor. I would say that You can't have it both ways. You can't say that this was only Bard's decision, and he did this over Strauss' objection, and simultaneously say Strauss is liable for retaliating or discriminating. Well, it's not just my argument. It's what Strauss testified herself. My understanding is that as the HR manager for the appellee, she had to sign off on the form. She would actually draft the form. But in this one instance alone, Bard overruled her. Normally, they would consult about any termination, and every other time they would realize But if you overrule her, that presupposes that she never signed off on it. But a minute ago, you said she signed off on it. So I'm getting confused about the record. Help me out. Sure. Signed off in the sense that she had to draft the document. Once Bard instructed her, he's terminated. He's going to go. She had to go through procedurally as the human resources manager to effectuate that termination. So who's the decision-maker? Chief Bard. Chief Bard is the decision-maker. Chief Bard overruled her. The HR manager is just there for moral support, window dressing. It seems strange. It is a unique situation, which I think goes to the argument of Mr. Moroz and how this was retaliation. Because in every other instance she testified, both individuals were aligned. They would agree on when they had to terminate an employee or when they did not. Here was the only time Strauss testified she can ever remember disagreeing with Chief Bard. And because of that, since Mr. Moroz was ultimately terminated, she was overruled by Bard, and he told her, we're going to terminate him. Let's go back for a minute. Because he initially comes verbally and just says, I want him gone, and she says no. Then he goes and writes a memo. Correct. What is the record? Is there anything in the record to tell us exactly what Strauss' response was to the merits or demerits of the arguments made by Bard in the memo? So in the memo, which was submitted on May 26th, three days later, approximately on 2016, and again, Strauss testified and Bard also testified that regarding the decision to terminate any other officer, he's never drafted a memo similar to this nature. But there was multiple reasons listed in there, and Strauss herself disputed almost all of them. When and how? She said she testified that she spoke to Chief Bard about the decision and, again, reiterated the fact that she disagreed with it. Can you help us with record cites on that? I don't believe I, Your Honor, have the noted citation for that. But your recollection is that in her deposition, she said that after Bard sent the memo, she spoke with him verbally and continued to disagree with the decision to terminate? Is that what the record supports? My understanding, I don't remember the exact timing of the last communication, but that she never wavered in disagreeing with the decision to terminate Mr. Merozan. I don't know if that happened after the memo. That's passive, though. I'm probing as to what she said after the memo. What does the record show that she said to continue to maintain the position that Merozan should not be fired? I don't recall specifically, Your Honor, regarding that. I do know that when she was deposed and we laid out and I questioned her about all the specific reasons that now Chief Bard is bringing up for the first time to Mr. Merozan, she disputed a number of them, including the complaints against him from the citizens. There were two. They happened months, if not years prior. She said there were no citizen complaints? She said they were always unsubstantiated, that they were never justified. The alleged purported sick out, it was investigated in February of 2016, and there was no merit to it. It was unsupported, unsubstantiated. And these things were never brought up to her previously by Bard as an issue for Mr. Merozan, and Bard never brought them up previously before the signing terminated him to Merozan. All right. So you've given us some arguments as to why the rationale of citizen complaint and sick out were implausible or not supported by the record. What evidence do you have to show that the other reasons given by Bard, namely the jurisdictional dispute or the insubordination, did Strauss also give you any evidence that those were implausible or inaccurate? I don't believe Strauss ever testified to those. Mr. Merozan testified, again, never issued any prior discipline before this. He never, in his opinion, ever obstructed or was insubordinate towards Chief Bard. He was always supportive of his protocols. His officers were always supportive of his protocols. In terms of issuing discipline to his officers, as lieutenant, he would issue discipline to the sergeants and to the officers. The only explicit example that Chief Bard brought up was not being willing to issue a PIP to a Sergeant Evans. Now, Mr. Merozan admits he did not issue him a PIP, but he would correct his behavior and issue him discipline, just not, I guess, the specific type of discipline that Chief Bard brings up in his memo. Thank you for your time, Your Honors. All right, we'll hear you on rebuttal, Mr. Olseas. Thank you. Ms. Mahler? Good morning, Your Honors. May it please the Court, my name is Emily Mahler. I'm here today on behalf of Appaloose, Philadelphia Housing Authority, Joanne Strauss, and Branville Bard. I would also like to reserve three minutes for rebuttal. No, rebuttal is for the appellant, not Appaloose. Sure. There's no cross-appeal here, right? That's correct. And we don't usually allow rebuttal and cross-appeal here. Understood. Sorry. No problem. So I wanted to start by just addressing some of the record citations that you were referring to when you were questioning counsel for the appellant. Joanne Strauss did indeed testify as to the specific reasons for termination that Branville Bard laid out in the termination memo. And the fact that she did not disagree with any of the substantive reasons for termination that are laid out in that memo is clear from the record. Who had the authority to dismiss somebody, to dismiss the plaintiff? Who's the decision-maker here? Branville Bard made the recommendation, and Joanne Strauss terminated Mr. Marozan from employment. Even though she disagreed? Well, she didn't disagree with the reasons for termination. She had concern with respect to the timeline, knowing that there were ongoing complaints. She disagreed that he should be terminated? She suggested, and it's in the record, that she suggested that perhaps Bard consider progressive discipline that was less than termination, but ultimately she did not disagree with any of the reasons that Chief Bard set forth for termination. Did Bard need her to sign off on a firing? Yes, that's correct. She's the ultimate decision-maker? That's correct. But there is evidence in the record that she – it was sort of an itchy trigger finger thing, right? I mean, too harsh. She was pushing back. Like, you know, where's the long train of abuses? Where's the record? And, boy, 10 days is suspect. That's all in the record, right? Right, and also – So really, don't we have to go to pretext on retaliation then? Because are you asking us to write an opinion that says 10 days as a matter of law cannot be, or is not, in this case, unusually suggestive? In this case, 10 days is not unduly suggestive in light of the fact that there were months and months of complaints by this same officer, and, indeed, he was actually promoted during that time period when he was complaining. What about the 10 days coupled with her statement that this is too close in time, and then the shifting rationale for the dismissal? So with respect to shifting rationale, there is no shifting. Certainly, the idea that someone is disruptive is not materially different from what's laid out in Chief Bard's memo. Indeed, you would read that, and those are all disruptions. The concerns that Chief Bard was bringing to Joanne Strauss's attention were, as your Honor mentioned, concerns that he was essentially poisoning young, impressionable officers within the ranks of the police department. Essentially, he was a toxic figure, and that's wholly different than someone who is, frankly, incompetent in their job. And so, you know, if we're talking about incompetence, that's something that perhaps can be solved by progressive discipline. I don't know how you argue he was incompetent. He seemed to be effective. It seemed to be more a difference in policy. Bard was moving in one direction, and we could call that new school, and Morozan was old school. Isn't that what happened here? Yes. That's what the records shout out to me. No, that's absolutely true. I apologize. I was unclear in my argument there. There's argument here by the appellant that the other individuals that are alleged comparators in this case should have, that John Morozan should have been treated the same way that they were, which was progressive discipline. And in this case, we're talking about something that's wholly different. We're talking about someone who is essentially a toxic force within the department, and, you know, that's something that... because of the lack of comparators, let's stick with retaliation for a minute. Mr. Olsey made some arguments a minute ago that go to the heart of step three of the Fuentes versus Persky pretext analysis. He said that the record showed that there wasn't a series of, or there weren't a series of citizen complaints. He said the record did not bear out this notion that he had caused a sick out. He admitted that there was no PIP for Evans, but he said that his client testified that he disciplined Evans in other ways without a PIP. So how do you show pretext here? Sure. Excuse me, how do you show no pretext? Sure. So with respect to the claim that there were no citizen complaints, that's a misrepresentation of the record. There were complaints. They were not ultimately founded.  I don't know that they weren't. You can't punish an officer because citizens complain if the complaints are invented or unfounded, right? He said a minute ago that there were complaints, but they were deemed to be unsubstantiated. That is correct. They were deemed to be unsubstantiated, but Bart's concern was with the volume of complaints that he was receiving within a very short period of time. Is it legal to dismiss somebody who's the subject of unsubstantiated complaints? Absolutely. With respect to at-will employment, if that's the determination made by the employer and it's not shown to be discriminatory, then certainly that would be grounds for dismissal at will. And there's no evidence that suggests that there's discrimination or retaliation here sufficient to overcome those legitimate non-discriminatory reasons. Why wasn't he fired before the overtime issue arose? The issues that arose came about when Bart started working as chief at PHA. He wasn't there throughout the entire tenure of John Morrison's employment. But he's only fired after he starts complaining about overtime, right? Well, he complained about overtime for a period of over a year. In that same year, then Bart comes to work at PHA. And as your Honor mentioned, it was determined by Chief Bart over the course of that year that essentially John Morrison's policing style was not compatible with what he was trying to do at PHA. But it wasn't until late May of 16 that he threatened to go outside of PHA with his complaints, right? That's correct. And then he made his final complaint about two weeks later on the 5th of June, right? That's correct. And he's fired 10 days later. That's correct. And his complaints about overtime were well-founded. They were. The Housing Authority was a disaster in terms of compensating its workers for overtime, right? That's correct. And Chief Bart, you know, talked at length in his deposition about the fact that he felt it was appropriate for John Morrison to go outside of PHA if his complaints weren't remedied. As he felt about the other employees who were complaining about issues with their pay as well, none of whom were terminated. And there's nothing in the record to suggest that any of these other employees whom within the record there's evidence that they complained and they complained in writing, but none of them were terminated. How many other employees complained about overtime? I don't have these. Does the record reflect that? Is it a few? Is it dozens? I believe it's at least 5, maybe 10, somewhere between those numbers. But your argument is if the real reason for termination or a reason for termination was complaining about overtime, then there would have been several others that were terminated as well. Because it's clear that there were others complaining about overtime. That's correct. And there's no explanation from the appellant as to why that is. So, you know, that essentially establishes sort of the inverse of any type of inference that the complaints about overtime were the reason for termination. Particularly, you know, coupled with the fact that the complaints went over for a period of over a year and Mr. Morrison was in fact promoted during that period. You don't think there's a difference between generally complaining and saying, all right, I've had enough, I'm going outside? I think that, you know, certainly I see your point as to saying I'm going outside. But again, Chief Bard's testimony that he felt it was appropriate for any PHA employees to go outside in order to have their pay remedied is certainly important. That testimony in the record is important and it's not refuted by the appellant. It would be a different record if Bard had threatened reprisal in response to the threat to go outside. Instead, Bard said, well, do what you need to do to get paid, basically. Is that your point? That's correct. He also didn't rationalize this as characterizing the plaintiff as a net will employee. We can fire him for whatever reason. That's correct. He initially, that was the terminology that he initially used. But again, that's not materially different from, you know, stating that, yes, I have a whole list of reasons why I'd like to. But ultimately, the way he characterized it when he spoke with Ms. Strauss was he's an at-will employee. We can terminate him. And, you know, he's not thinking about retaliation or discrimination when he's making that decision, which is why he doesn't engage in any long, you know, long explanation with Ms. Strauss as to why. Because he was at-will, why did she, Strauss push back? Why didn't she just say, all right, you're right, he's at-will, but for whatever reason, you don't like him, we'll let him go. So Ms. Strauss testified about that in the record, that she is, you know, as an attorney, as someone who's been involved in discrimination and retaliation lawsuits, she's well aware of the fact that, you know, someone who has engaged in protected activity under the law would be entitled to protection. And so she was concerned about the fact that because of this timing, she wanted to be, you know, be certain that there wouldn't be, you know, any concerns with respect to a future lawsuit. And that's why she instructed Bard to, you know, explain to me what are the reasons that you intend to take this action against the employee. But from your perspective, what amount of time between the protected activity and the adverse action would be enough to not make it unusually suggestive? On its own, you know, something like immediate, you know, something like that very day. But I think that the case law is fairly clear that it has to be very, very close in time to, you know, essentially be per se unlawful without something more, you know, and if you look at the case law that's cited in both sets of briefs that have been submitted in this case, the pattern of antagonism is something that's present in all of those cases. How long did he work there? He was three years in total. Shouldn't the tenure of the employee have some relevance to the suggestiveness of the time frame? In other words, if you onboard a new person on Monday and it's, there's trouble from the get-go and you fire the person on Friday, you know, that would seem not unnecessarily suggestive perhaps. But yet, if someone works somewhere for a period of years and you only, you get rid of them 10 days after the problem or five days after the problem, that's a long time. That's a long time. Well, I think in that case, what's important is the fact that Chief Bard wasn't working with Lieutenant Morozo in the capacities of lieutenant for that entire time frame. You know, he, first of all, when he started with the Philadelphia Housing Authority Police Department, Morozo was just an officer. He was eventually promoted to lieutenant and then he was working closely with Bard as a member of the management. Is there evidence in the record to support that Morozo had already complained about overtime before he was promoted? I believe so. The complaints began in the summer of 2015 and he was promoted in August of 2015. That argument goes both ways, right? I mean, you could also make the argument that, yeah, he was doing a good job, but we're really upset about these complaints and that's why we fired him. The promotion? Yeah, well, he's doing a good job, good enough to be promoted, but these complaints are really annoying, these overtime complaints. We're going to get rid of them because of these complaints. I would say, though, that the complaints with respect to the citizen complaints, those all arose after the promotion. His complaints about overtime is what I'm talking about. Sure. No, I understand, but all of the instances that are set forth in the memo supporting the reasons for his termination, that all arose in that period after the promotion to lieutenant. Thank you, Ms. Moller. Thank you. We have rebuttal from Mr. Olseas. Could you start with the argument counsel's making that nobody else that was complaining about overtime and lack thereof was dismissed? So, again, the great distinction in my understanding is that while there may have been a few other officers complaining about not receiving their full compensation, that is clear. None of them rose to the amount they were unpaid, like Ms. Morozan, which was approximately $5,000. None of them involved the Office of Audit and Compliance, like Ms. Morozan did, and none of them also on the record that I'm aware of ever threatened outside action. That is the distinction, and then immediately after doing so, the very next day is where Bard makes up his mind, I need to terminate Morozan. And the issues that are brought up that counsel discussed in his memo were never previously addressed with Ms. Morozan whatsoever, never previously addressed with Strauss. For instance, the apparent multiple complaints against police Morozan received, on the record there's two, and they were received months prior, and again, both unsubstantiated. The alleged sick out happened apparently in February of 2016, three or four months prior to when the time is now he's complaining. And again, investigated, unsubstantiated. All of this now is being drug up by Bard to justify to Strauss, who has turned him down on two occasions, that he's not a disruption, that you can't fire him for being at will, to now he needs to think of another reason to get rid of him. And while I certainly agree that ten days is unusually suggestive to get to in front of a jury to argue retaliation, here I would argue the timing is one day. The decision was made on May 23rd, 2016, and then it was effectuated after already being reached in the middle of June. Bard's not the ultimate decision maker, Strauss is. And respectfully, I would disagree, especially considering Strauss' testimony on that, that she never approved it, never agreed with it, and it's the only time. You've got to quote that for us. Tell us exactly what she said on that. My understanding is it's the only termination that Bard wanted to do that she never agreed with. She testified on that. Respectfully, we don't want your understanding. Quote us the language. The reason I think this is important is that if you can cite a deposition transcript where Strauss said, I did not approve this termination, it was Bard's decision, it was done over my objection, then two things happen here. Strauss is out of the case, and you never should have sued her, or you should have dismissed her midstream. And your claim against Bard is stronger, because then they can't hide behind Strauss' decision to fire him. It's Bard all the way. So cite us the evidence. Cite us the transcript that supports your argument. In her deposition, she stated she never agreed to it and was overruled. I think what Judge Hardeman is asking for is a page number. I don't have the page number. I apologize, Your Honor, in front of me now, but I believe it's part of also the legal brief that I submitted for this appeal as well. I thought we've established today that Bard by himself can't fire Murozen. Procedurally to effectuate it, HR had to do it. This was a unique scenario that Strauss testified. Despite whatever misgivings she had, Strauss eventually agreed, right? She eventually signed off on it, correct, yes. Yes, Your Honor. Thank you so much. Thank you very much, Mr. Olseas. Thank you, Ms. Mahler. We'll take the case under advisement.